IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GLORIA ANN CHAPMAN, | ) | CASE NO.  1:14-cv-00545 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Gloria Ann Chapman ("Plaintiff" or "Chapman") seeks judicial review of the

final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14.   As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

### I.  Procedural History

Chapman protectively filed an application for Disability Insurance Benefits ("DIB") on

August 1, 2011, and an application for Supplemental Security Income ("SSI") on July 4, 2011.[1]

Tr. 11, 75-76, 77, 90, 209-217, 231.  She alleged a disability onset date of March 22, 2009.  Tr.

11, 32, 77, 90, 230.  She alleged disability due to Arnold-Chiari malformation,[2] neuro-

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 3/2/2015).

[2] Arnold-Chiari malformation is a "herniation of the cerebellar tonsils and vermis through the foramen magnum into the spinal canal.  It is always associated with lumbosacral myelomeningocele, and hydrocephalus and mental defects are common."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1098.

cardiogenic syncope, back injury, hip pain, and memory issues.[3]  Tr. 77, 90, 105-106, 135, 144,
153, 160, 253.   Chapman's applications were denied initially and upon reconsideration by the
state agency.  Tr. 135-150, 153-166.   She requested an administrative hearing.  Tr. 167-168.
On September 24, 2012, Administrative Law Judge Susan Giuffre ("ALJ") conducted an
administrative hearing.  Tr. 26-74.

In her October 22, 2012, decision, the ALJ determined that Chapman had not been under
a disability from March 22, 2009.  Tr. 8-25.  Chapman requested review of the ALJ's decision by
the Appeals Council.  Tr. 6-7.  On January 23, 2014, the Appeals Council denied Chapman's
request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal, educational and vocational evidence

Chapman was born in 1972.  Tr. 32.  She was 40 years old at the time of the hearing and
was living with roommates.  Tr. 32, 44.  She graduated high school (Tr. 32, 254) and had various
jobs over the years, including work as a management trainee, stock clerk, department manager,
retail store manager, object  sales person, picture framer, accounting assistant, customer service,
data entry clerk, cashier, daycare worker, and audit clerk (Tr. 58-64, 234, 254).[4]  She last worked
as a manager in training at a bookstore and stopped working in May 2009.  Tr. 33, 41 234, 253.

### B.    Medical evidence[5]

#### 1.    Treating source medical evidence

---

[3] Although not initially alleged, the possibility of a mental impairment was considered during the processing of
Chapman's claims.  Tr. 135.

[4] Chapman also worked briefly as a volunteer for the Cleveland International Film Festival.  Tr. 40-41.

[5] Chapman's claims relate to her alleged physical impairments and more particularly to the ALJ's assessment of her
carpal tunnel syndrome and Arnold-Chiari malformation.  Thus, the medical evidence summarized herein is
primarily related to those conditions.

Chapman has been treated primarily by physicians at MetroHealth.  Tr. 289-416, 439-500.  She has a history of syncope episodes[6] and migraine headaches.  Tr. 496.   Chapman has also been diagnosed with an Arnold-Chiari malformation.  Tr. 413, 414.  In September 2009, Chapman experienced a syncope episode and fell from a second story balcony at her house resulting in a sacral fracture.  Tr.  363, 342, 368, 370-383.

Following her fall in September 2009, Chapman started seeing cardiologist Dr. Ottorino Constantini, M.D.   Tr. 357.  During an October 30, 2009, visit, Dr. Constantini noted that, since Chapman's discharge, she had had one syncope episode.  Tr. 357.  That episode had occurred on October 13, 2009, while Chapman was sitting in her bed.  Tr. 357.  Chapman indicated that the episode lasted a few seconds and then she came to.  Tr. 357.  Chapman reported that she was feeling okay otherwise.  Tr. 357.  However, she still remained unable to bear weight.  Tr. 357.  Dr. Constantini assessed syncope concluding that Chapman's episodes sounded neruocardiogenic.  Tr. 358.  He noted that, because of her sacral fracture, he had been unable to conduct a tilt table test[7] in order to further evaluate her condition to determine whether it was a blood pressure problem or a problem with a drop in heart rate.  Tr. 358.  Dr. Constantini prescribed medication for the syncope episodes and migraines.  Tr. 358.  He also encouraged her to stay well hydrated and to watch her salt intake.  Tr. 358.  During her October 30, 2009, visit, Chapman asked Dr. Constantini to complete SSI Disability papers because she kept losing jobs as a result of her fainting spells.  Tr. 358.  Dr. Constantini noted, "I think that may be hard to justify . . . When she is able to stand I will get a tilt table test."  Tr. 358.

[6] Medical records reflect that Chapman has been having syncope episodes since childhood.  Tr. 357, 496. "Syncope" is "a temporary suspension of consciousness due to generalized cerebral ischemia; called also *faint*."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1818.

[7] A "tilt table test" is a "measurement of various bodily responses while the patient is tilted to different angles on a tilt table, usually head up, such as monitoring of circulatory, cardiac, and neurologic responses."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1901.

Following his October 30, 2009, examination, Dr. Constantini completed medical forms that included his opinions regarding Chapman's functional limitations.[8]  Tr. 496-498.  In the Medication Dependency form, Dr. Constantini noted Chapman's medical conditions (recurrent syncope and migraine headaches) and listed her medications (midodrine and propranolol).  Tr. 496.  In the Basic Medical form, Dr. Constantini recapped his recent treatment of Chapman noting that he had recommended a tilt table test in order to further evaluate her syncope episodes.  Tr. 497.  However, due to Chapman's fracture, Dr. Constantini had not yet been able to perform the test.  Tr. 497.  Dr. Constantini opined that Chapman was limited to standing/walking 1 to 2 hours in an 8-hour workday and standing/walking without interruption for 20 to 30 minutes.  Tr. 498.  He also opined that Chapman was limited to lifting/carrying up to 10 pounds frequently and up to 10 pounds occasionally.  Tr. 498.  Dr. Constantini noted no sitting limitations.  Tr. 498.  In support of his findings, Dr. Constantini stated, "The patient may faint without notice.  Standing on ladders or in dangerous places or walking down the stairs may result in injury.  The patient should not drive."  Tr. 498.   He also checked a box on the form indicating that Chapman was "unemployable."  Tr. 498.

In or around 2011, Chapman saw Dr. Kip Smith for neuropsychological testing.  Tr. 30-31, 49, 499-500.   The results of the testing are contained in a report titled "Neuropsych Test Results and Recommendations."[9]  Tr. 499-500.  The test results generally showed average abilities.  Tr. 499-500.  However, the testing showed below average results for Chapman's

---

[8] It appears that there were two forms completed.  One form is titled Ohio Department of Job and Family Services – Disability Medical Assistance (DMA) Physician Certification of Medication Dependency ("Medication Dependency" form).  Tr. 496.  The Medication Dependency form is dated November 3, 2009.  Tr. 496.  The other form is entitled Basic Medical.  Tr. 497-498.  The Basic Medical form is not dated but Dr. Constantini indicated that the date of last exam was October 30, 2009.  Tr. 498.

[9] The neuropsychological test results are not signed.  Tr. 499-500.  However, the ALJ agreed to accept the report without a signature.  Tr. 31.

memory for verbal information and in some areas of attention and concentration.  Tr. 500.  No specific recommendations were included in the report.  Tr. 499-500.

### 2.    Non-treating source medical evidence

### a.    Consultative examining physician

On November 10, 2011, Dr. Edward Butler, M.D., saw Chapman and conducted a consultative examination.  Tr. 427-436.  In the section titled "chief complaint," Dr. Butler noted that Chapman "was diagnosed with right carpal tunnel syndrome in 2001 via electro diagnosis. The testing revealed a mild right carpal tunnel syndrome. Splinting does reduce her symptoms. She has pain, numbness, and tingling at the right hand.  The pain is intermittent, sharp, and a 4/10."[10]  Tr. 427.  With the exception of Chapman's flexion of the dorsolumbar spine,[11] her range of motion and manual muscle testing was normal, including her grasping, manipulating, pinching and fine coordination abilities.  Tr. 433-436.  In summary, Dr. Butler stated, "This is a 39-year old female with migraine headache, syncope, and asthma."  Tr. 431.  He followed that summary with a listing of 11 diagnoses, including right carpal tunnel syndrome.  Tr. 431.  Dr. Butler noted that Chapman's prognosis was stable and, in the section titled "medical source statement," Dr. Butler opined that Chapman "should not work at heights or operate heavy machinery.  She should avoid respiratory irritants.  There are mild limitations to pushing, pulling, and lifting."  Tr. 431.

### b.    Reviewing physicians

---

[10] The 2001 medical records referenced by Dr. Butler are not in the record.  Tr. 14; Doc. 15, p. 7.

[11] Normal range for dorsolumbar spine flexion was 90 and Chapman's testing results for that area were 60.  Tr. 435.

On November 16, 2011, state agency reviewing physician Eli Perencevich, D.O., completed a Physical RFC assessment.  Tr. 83-85.[12]  He opined that Chapman could occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand/walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; pushing and pulling were unlimited except for the lift/carry restrictions.  Tr. 83.  He also opined that, due to Chapman's obesity and lumbar sprain, Chapman could never climb ladders/ropes/scaffolds and could only crouch frequently.  Tr. 84.  Also, due to Chapman's history of syncope, Dr. Perencevich opined that Chapman would need to avoid all exposure to fumes, odors, dusts, gases, poor ventilation, etc. and avoid all exposure to hazards (machinery, heights, etc.).  Tr. 84-85.

On March 16, 2012, on reconsideration, state agency reviewing physician Leigh Thomas, M.D., reached the same Physical RFC assessment as Dr. Perencevich.  Tr. 112-114, 126-128.

**C.      Testimonial evidence**

**1.      Plaintiff's testimony**

Chapman was represented by counsel and testified at the hearing.  Tr. 31-50, 53-56, 57, 59-62, 63-65, 73.   In response to the ALJ's inquiry as to what limits her ability to work, Chapman indicated that she had gotten into a lot of trouble calling off because of migraines.  Tr. 41.  She explained that the big reason she could not work was that she passes out without any warning.  Tr. 41-42.  She explained that a syncope episode can occur while she is sitting, lying down, walking, or standing.  Tr. 42.  The episodes occur randomly.  Tr. 42.  She has had as many as three episodes occur in one week and she has gone as long as three months without an episode occurring.  Tr. 42.  Chapman started seeing cardiologist Dr. Constantini in September 2009.  Tr. 48.  Dr. Constantini tried one medication but he took Chapman off of it because she starting passing out more often.  Tr. 42.  Chapman saw Dr. Constantini a few times until he advised her

---

[12] Dr. Perencevich's Physical RFC assessment is also contained in the record at Tr. 96-98.

that there was nothing further he could do for her. Tr. 42, 48-49. He recommended that she see someone in Toledo. Tr. 42. However, Chapman had no ability to get to Toledo. Tr. 42.

Chapman indicated that her last episode had occurred a few weeks prior to the hearing. Tr. 42. She was sitting on the edge of the couch reaching for a glass of water when she fell, hit her left thigh on the arm of the couch and hit her back on the coffee table.[13] Tr. 42. Her roommate had informed Chapman that she had been unconscious for about 45 seconds. Tr. 43. Following an episode, Chapman usually has a headache and neck spasms for about three days. Tr. 43. Chapman takes butalbital and Tylenol-3 with codeine for her headaches and spasms. Tr. 43. She indicated that it helps some but she noted that her doctors will no longer prescribe the painkillers because they do not know where her pain is coming from. Tr. 43. She still takes Tylenol-3 for pain. Tr. 47. Her roommate gets her Tylenol-3 with codeine from Canada. Tr. 43. Chapman indicated that it is sold as a generic brand in a retail store. Tr. 43.

Chapman's primary care physician requested an MRI but Chapman indicated that Medicaid denied the request. Tr. 43-44. Chapman also noted that Medicaid had denied her primary care physician's request that Chapman see someone for her eyes to assess whether there was some pressure issues related to her head issues. Tr. 44.

Chapman has also seen Dr. Kip Smith who performed neuropsychological testing. Tr. 49. Chapman did not continue treatment with Dr. Smith. Tr. 49. Dr. Smith referred Chapman to another physician. Tr. 49. However, Chapman was unable to see that doctor because of issues with Medicaid. Tr. 49.

In 2009, Chapman was watering plants on the balcony at her house and the next thing she knew was she had fallen off the balcony and landed on a concrete block. Tr. 46. She had taken

---

[13] Chapman noted that her description of the episode was based on her roommate's description because, when an episode occurs, she does not remember what happened. Tr. 42.

the railing off the balcony when she fell.  Tr. 46.  The balcony was two stories from the ground.  Tr. 46.  She is not certain, but she believes that, when she fell, she hit her lower back first and then her head.  Tr. 46.  She broke her sacrum.  Tr. 45, 49.  She was in rehab for about a month after the accident.  Tr. 45.  While she was in rehab, she had a syncope episode and was sent to the cardiology unit.  Tr. 45.  Since the accident, Chapman has had difficulty remembering things as simple as how to make a sandwich.  Tr. 45-46.  Because of the pain in her back, Chapman walks much slower than everyone else.  Tr. 49.

Chapman also has asthma for which she uses an inhaler.  Tr. 47-48.  At the end of 2011, she had to be intubated because of her asthma.  Tr. 48.  She has problems with temperature extremes.  Tr. 48.

Although she could not recall when she was diagnosed, Chapman indicated that when she was working as an office employee, she was diagnosed with carpal tunnel on the right side.  Tr. 49-50.  She stated that she still has problems with her right hand.  Tr. 50.  She does not really have problems with her left hand.  Tr. 50.  She indicated that repetitive motion does not really cause her problems with her hand.  Tr. 50.  Instead, she has problems when she grips things such as when she holds onto to a pen or pencil and writes.  Tr. 50.

At home, Chapman does not do a lot physically.  Tr. 44.  Her roommates generally take care of things.  Tr. 44.  She is able to cook but usually only cooks when someone else is around in case she passes out with a knife in her hand.  Tr. 45.  She can do the laundry provided that someone carries the laundry downstairs and back upstairs.  Tr. 45.  If Chapman tries to carry anything over 10 pounds, she has extreme lower back pain.  Tr. 45.

**2.      Vocational Expert's testimony**

Vocational Expert ("VE") Barbara Burk testified at the hearing.  Tr. 50-73.  The VE discussed and described Chapman's past relevant work.  Tr.  50-65.  The ALJ then asked the VE to assume a hypothetical individual of Chapman's age, education, and past relevant work experience with the capacity to perform light work, meaning lifting 20 pounds occasionally and 10 pounds frequently; standing or walking six out of eight hours; sitting six out of eight hours, but can never climb ladders or scaffolds; can frequently crouch; must avoid all exposure to fumes, dust and environmental pollutants and must avoid all exposure to hazards defined as unprotected heights and industrial machinery; has the capacity for simple, repetitive tasks performed in a setting that does not need close, sustained focus or attention or sustained fast pace.  Tr. 65-66.  The VE indicated that the described individual would not be able to perform Chapman's past relevant work.  Tr. 66.  However, the VE indicated that there would be other jobs available in the local or national economy that the described individual could perform, including (1) housekeeping/cleaner, a light, unskilled job with 1,500 jobs available regionally and more than 132,000 nationally; (2) inspector/hand packager, a light, unskilled job with 680 jobs available regionally and about 39,000 nationally; and (3) commercial cleaner, a light unskilled job with 1,800 jobs available regionally and over 100,000 nationally.  Tr. 66-67.

In response to questioning by Chapman's counsel, the VE indicated that, if the hypothetical included an additional limitation of no exposure to chemicals the cleaner jobs would remain available based on the Department of Labor's classifications.  Tr. 68-70.  She stated, however, that based on her own experience, the occupational base for the cleaning jobs would be reduced to some extent if there was a limitation of no exposure to chemicals.  Tr. 67-70.

Also, in response to questioning by Chapman's counsel, the VE indicated that an added limitation of occasional pushing, pulling, and lifting 6-10 pounds would preclude light work

because light work requires occasional lifting of 20 pounds and frequent lifting of 10 pounds. Tr. 70-71.  Chapman's counsel then asked whether the occupational base for the identified jobs would be reduced if the individual was limited in terms of light work to occasional pushing, pulling and lifting. Tr. 71-72.  The VE indicated that such a limitation might preclude the cleaning jobs but it would not preclude inspector/hand packager jobs at the sedentary level.  Tr. 72.

Chapman's counsel also asked the VE whether there would work available in significant numbers in the national economy for the individual described in the ALJ's hypothetical who would also miss 2 to 3 days per month due to unavoidable blacking out.  Tr. 72.  The VE indicated that there would be no work available based on that hypothetical because 2 to 3 is an unacceptable number of absences.  Tr. 72.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[14] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[14] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[15] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[16] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

---

[15] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[16] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In her October 22, 2012, decision, the ALJ made the following findings:[17]

1.     Chapman met the insured status requirements through June 30, 2014.  Tr. 13.

2.     Chapman had not engaged in substantial gainful activity since May 22, 2009, the alleged onset date.  Tr. 12.

3.     Chapman had the following severe impairments: obesity; asthma; Arnold-Chiari malformation on brain MRI; syncope; lumbar sprain; status-post sacral fracture; adjustment disorder with mixed anxiety and depressed mood; post-traumatic stress disorder; dissociative identity disorder, in remission.  Tr. 13.  Carpal tunnel was found to be a non-severe impairment.  Tr. 14.

4.     Chapman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 14-16.

5.     Chapman had the RFC to perform light work except for the following limitations: could never climb ladders, ropes, or scaffolds; could frequently crouch; must avoid all exposure to fumes, dust, and environmental pollutants; must avoid all exposure to hazards, defined as unprotected heights and industrial machinery; limited to simple, repetitive tasks, and completing tasks in a setting not needing sustained focus, attention, or fast pace (defined in the Dictionary of Occupational Titles as working to prescribed tolerance or set standard).  Tr. 16-20.

6.     Chapman was unable to perform past relevant work. Tr. 20.

7.     Chapman was born in 1972 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr.20.

8.     Chapman had at least a high school education and was able to communicate in English.  Tr. 20.

9.     Transferability of job skills was not material to the determination of disability.  Tr. 21.

10.    Considering Chapman's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that

---

[17] The ALJ's findings are summarized.

Chapman could perform, including housekeeper cleaner; hand packager;
and commercial cleaner.  Tr. 21.

Based on the foregoing, the ALJ determined that Chapman had not been under a
disability from May 22, 2009, through the date of decision.  Tr. 22.

## V. Parties' Arguments

### A.    Plaintiff's arguments

Chapman argues that the ALJ erred at Step Two and/or in assessing Chapman's RFC
when the ALJ concluded that carpal tunnel syndrome was not a severe impairment.  Doc. 15, pp.
5-8.  Chapman adds that, if the ALJ believed that there was insufficient evidence regarding
carpal tunnel, the ALJ should have taken steps to further develop the record rather than interpret
the medical evidence.  Doc. 15, pp. 7-8.

Chapman also argues that the ALJ's RFC assessment and Step Five finding are not
supported by substantial evidence for the following reasons: the ALJ did not adequately account
for limitations in pushing, pulling and lifting contained in the report of consultative examining
physician Dr. Butler; the record is devoid of evidence as to the number of jobs that exist in the
national economy for the inspector/ hand packager job; the ALJ did not adequately account for
migraines and recurrent blackouts (syncope) caused by Arnold-Chiari malformation (one of
Chapman's severe impairments); and the ALJ failed to support with good reasons her rejection
of the opinion of Chapman's treating cardiologist Dr. Constantini.  Doc. 15, pp. 8-10.

### B.    Defendant's arguments

In response, the Commissioner asserts that substantial evidence supports the ALJ's
finding that Chapman's alleged carpal tunnel syndrome was not a severe impairment, the RFC,
and the Step Five finding.  Doc. 16, pp. 7-12.  She argues that the ALJ found other impairments
to be severe and continued with the sequential evaluation process and, therefore, the ALJ's Step

13

Two finding is not a basis for reversal.  Doc. 16, pp. 8-9.  With respect to Chapman's claim that the ALJ should have further developed the record, the Commissioner argues that, except where there are special circumstances, which were not present in this case, it is a claimant's burden to provide sufficient evidence demonstrating disability.  Doc. 16, p. 9.  The Commissioner also argues that the ALJ did not improperly evaluate the medical evidence, noting that it is the responsibility of the ALJ, not a doctor, to assess a claimant's RFC and that the ALJ properly considered Dr. Butler's opinion.  Doc. 16, pp. 9-10.

The Commissioner also argues that substantial evidence supports the ALJ's assessment of Chapman's Arnold-Chiari malformation and Dr. Constantini's opinion.  Doc. 16, pp. 10-14.  With respect to Chapman's claim that the record did not contain job numbers, the Commissioner points to the portions of the record showing that the VE provided the available number of jobs for the inspector/hand packager job.  Doc. 16, p. 11, n. 6.

**VI. Law & Analysis**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

14

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.    **The ALJ's Step Two finding regarding carpal tunnel syndrome is not a basis for reversal**

Chapman argues that the ALJ erred in not finding that carpal tunnel syndrome was one of her severe impairments.  Doc.  15, pp. 5-8.  Chapman contends that the ALJ disregarded evidence in the record regarding her carpal tunnel syndrome and/or improperly interpreted the medical evidence without the support of evidence from an acceptable medical source.  Doc. 15, pp. 5-8.  Chapman also argues that, if the ALJ deemed the evidence insufficient, she should have taken steps to further develop the record.  Doc. 15, pp. 7-8.

At Step Two, a claimant must show that she suffers from a severe medically determinable physical or mental impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  It is Chapman's burden to show the severity of her impairments.  *Foster v. Sec'y of Health & Human Svcs.,* 899 F.2d 1221, *2 (6th Cir. 1990) (unpublished) (citing *Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986).  An impairment is not considered severe when it does not significantly limit the claimant's physical or mental ability to do basic work activities (without considering the claimant's age, education, or work experience).  *Long v. Apfel*, 1 Fed. Appx. 326, 330-332 (6th Cir. 2001); 20 C.F.R § 404.1521(a).  Basic work activities are defined by the regulations as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  Examples, include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching,

carrying, or handling; (2) the capacity to see, hear and speak; (3) the ability to understand, carry out, and remember simple instructions; (4) use of judgment; (5) ability to respond appropriately to supervision, co-workers, and usual work situations; and (6) the ability to deal with changes in a routine work setting.  *Id.*

The Sixth Circuit has construed Step Two as a *de minimis* hurdle such that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 19*88).  However, as noted by the *Higgs* court, a diagnosis alone "says nothing about the severity of the condition."  *Id.* at 863.  Thus, where there is a lack of objective medical findings to support an opinion, findings of no severe impairment have been upheld.  *Id.*

Where an ALJ finds one severe impairment and continues with subsequent steps in the sequential evaluation process, an error at Step Two may not warrant remand.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 19*87) (the Commissioner's failure to find claimant's cervical condition severe was not reversible error because the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process)*; see also Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 20*08) (relying on *Maziarz* when finding that, because the ALJ had found other impairments severe, the fact that some other impairments were found to be non-severe at Step Two was not reversible error).

Here, since the ALJ found that Chapman had severe impairments at Step Two, [18] the ALJ did not dismiss Chapman's claim.  Rather, she proceeded with subsequent steps in the sequential analysis.  Accordingly, Chapman has failed to demonstrate that ALJ's failure to find carpal

---

[18] Obesity, asthma, Arnold-Chiari malformation on brain MRI, syncope, lumbar sprain, status-post sacral fracture, adjustment disorder with mixed anxiety and depressed mood, post-traumatic stress disorder, and dissociative identity disorder, in remission.  Tr. 13.

tunnel syndrome to be a severe impairment constitutes reversible error.  *Maziarz*, 837 F.2d at

244.

Additionally, the ALJ explained her rationale for finding that Chapman's alleged carpal

tunnel syndrome was not a severe impairment and Chapman has failed to demonstrate that the

ALJ's finding was not supported by substantial evidence.  Tr.  14.  With respect to Chapman's

alleged carpal tunnel syndrome, the ALJ stated:

> The claimant reported difficulty with dropping objects due to right hand pain and
> numbness.  While the consultative examining physician noted that the claimant
> reported a history of carpal tunnel (Exhibit 4F, p. 6), there were no objective
> findings or diagnostic studies in the record to support the existence of a medically
> determinable impairment.   Physical examinations routinely revealed normal
> sensation and range of motion of all extremities.  At the consultative examination,
> the claimant demonstrated normal grip strength in both hands (Exhibit 4F, p. 8).
> Further, the claimant received no treatment for this impairment during the
> relevant  period, and there was no evidence that she complained of these
> symptoms to her treating sources.  Therefore, the undersigned cannot find work-
> related limitations related to these allegations, as no treating or examining
> physician has diagnosed a medically determinable impairment that would
> reasonably be expected to produce the following pain and symptoms as alleged by
> the claimant.

Tr. 14.

Chapman does not challenge the ALJ's finding that the record does not contain objective

findings or diagnostic studies to support a finding that her alleged carpal tunnel syndrome is a

medically determinable severe impairment.  Nor does she submit records supporting the alleged

2001 diagnosis of carpal tunnel syndrome.  Rather, she relies on Dr. Butler's 2011 report

reflecting a 2001 diagnosis of carpal tunnel, her own subjective complaints, and Dr. Butler's

conclusion that Chapman had "mild limitations" regarding pushing, pulling, and lifting.  Doc. 15,

p. 7.

A review of the record demonstrates that the ALJ's Step Two finding is supported by

substantial evidence.  As noted by the ALJ, although Dr. Butler noted that Chapman had a prior

diagnosis of carpal tunnel,[19] there were no objective findings or diagnostic studies to support the existence of such an impairment.  Tr. 14.  In fact, as observed by the ALJ, Dr. Butler's own objective manual muscle testing revealed that Chapman had normal grip bilaterally.  Tr. 14, 433.  Dr. Bulter's testing also revealed that Chapman had normal manipulation, pinch, and fine coordination bilaterally.  Tr. 433.  Also, as noted by the ALJ, other physical examinations revealed normal sensation and range of motion in Chapman's extremities.  Tr. 14, 291-292 (August 4, 2011, emergency room department visit revealing normal range of motion in all four extremities and intact distal pulses to all four extremities); 470-471 (February 24, 2012, office visit revealing sensation generally intact[20] and 5/5 grip bilaterally).   As additional evidence of the non-severe nature of Chapman's carpal tunnel syndrome, the ALJ noted that Chapman had not sought treatment for the impairment during the relevant period and had not complained of symptoms relating to the alleged impairment to treating sources.  Tr. 14.

Although Chapman relies on a 2001 carpal tunnel diagnosis and her own subjective complaints to support her claim that the ALJ erred in not finding carpal tunnel to be a severe impairment, she has not produced the alleged 2001 records supporting such a diagnosis nor has she produced any other objective evidence to support a finding that carpal tunnel was a medically determinable severe impairment.  *See Foster,* 899 F.2d 1221, *2 (indicating that, at Step Two, the burden remains with the claimant to demonstrate the severity of her impairments).  To the extent that Chapman relies on Dr. Butler's opinion that Chapman had limitations in pushing, pulling and lifting (Tr. 431) to support her claim that the ALJ erred in not finding carpal

---

[19] Although Dr. Butler included carpal tunnel syndrome in the list of diagnoses in his report, his summary conclusion was, "This is a 39-year-old female with migraine headache, syncope, and asthma."  Tr. 431.

[20] The record reflects sensation was intact with the exception of some numbness over the left lateral dorsal palm close to the second digit.  Tr. 470.  Chapman did not associate the numbness in that area with carpal tunnel.  Tr. 470.  She reported that she had had an IV in that area and it had been numb ever since.  Tr. 470.

tunnel syndrome to be a severe impairment at Step Two, Dr. Butler did not directly correlate those functional limitations to a carpal tunnel diagnosis.  Moreover, Dr. Butler concluded that any such limitations would be *mild* (Tr. 431) and an impairment is not considered severe when it does not *significantly* limit a claimant's physical or mental ability to do basic work activities.  *Long v. Apfel*, 1 Fed. Appx. at 330-332; 20 C.F.R § 404.1521(a).

Chapman's attempt to sidestep her burden of demonstrating the severity of her impairment by faulting the ALJ for not obtaining the 2001 records or ordering another consultative examination (Doc. 15, pp. 7-8) is misplaced because Chapman has not alleged or shown special circumstances or that a heightened duty to develop the record applied in this case and, absent special circumstances, such as where a claimant is not represented by counsel, there is no heightened duty on an ALJ to develop the record and the claimant bears the burden of proving disability.  *See Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008).

Based on the foregoing the Court concludes that reversal and remand is not warranted based on the ALJ's Step Two finding.

**B.     The ALJ's RFC and Step Five finding are supported by substantial evidence.**

Chapman contends that the ALJ's RFC assessment and Step Five finding are not supported by substantial evidence because the ALJ did not adequately account for limitations in pushing, pulling and lifting contained in the report of consultative examining physician Dr. Butler; the record is devoid of evidence as to the number of jobs that exist in the national economy for the inspector/ hand packager job; the ALJ did not adequately account for migraines and recurrent blackouts (syncope) caused by Arnold-Chiari malformation (one of Chapman's severe impairments); and the ALJ failed to support her rejection of the opinion of Chapman's treating cardiologist Dr. Constantini with good reasons.  Doc. 15, pp. 8-10.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. § 404.1545(a); 20 C.F.R. § 404.1546(c).   It is the responsibility of the ALJ, not a physician, to assess a claimant's RFC.  *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence . . . the question must accurately portray a claimant's physical and mental impairments.  The hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

### 1. The ALJ adequately accounted for limitations in pushing, pulling, and lifting as contained in Dr. Butler's opinion

Chapman claims that, when assessing her RFC, the ALJ failed to take into consideration Dr. Bulter's opinion that Chapman would have mild limitations in pushing, pulling and lifting. Doc. 15, p. 9.

Here, the ALJ clearly considered Dr. Butler's opinion.  Tr. 20.  The ALJ gave "more weight" to the opinion of Dr. Butler that Chapman would have "mild" exertional limitations.  Tr. 20.  The ALJ concluded that Dr. Butler's opinion was consistent with the "relatively normal findings during a physical examination, which included full range of motion in the spine and all extremities, and normal strength."  Tr. 20 (referencing Exhibit 4F, Tr. 426-437).   The ALJ's RFC restricted Chapman exertionally to light work.  Tr.  16.  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with

some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

Chapman has failed to demonstrate how the ALJ's light exertional RFC failed to adequately account for "mild" limitations in pushing, pulling and lifting.  Chapman suggests that in order to have adequately accounted for Dr. Butler's finding of "mild" limitations, the ALJ was required to include an RFC limitation of occasional pushing, pulling and lifting. Doc. 15, p. 9. However, she provides no authority for her proposition and, even if there was a limitation of occasional pushing, pulling and lifting, the VE testified that one of the three identified jobs, i.e., the inspector/hand packager job, would remain available at the sedentary level.[21]  Furthermore, it is the responsibility of the ALJ, not a physician, to assess a claimant's RFC.  *Poe*, 342 Fed. Appx. at 157.   In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . .  [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

### 2.  The VE provided testimony regarding the number of available inspector/ hand packager jobs

In arguing that the ALJ erred at Step Five, Chapman contends that the record is devoid of evidence as to the number of jobs that exist in the national economy for the inspector/hand packager job.  Doc. 15, p. 9.  However, a review of the record demonstrates that the VE testified that there were about 680 inspector/hand packager jobs available in northeast Ohio and about 39,000 jobs available nationally at the unskilled, light level.  Tr. 67.  To the extent that Chapman's argument is based on a lack of identification of jobs numbers for the inspector/hand

---

[21] The VE could not definitely say whether the two cleaner jobs would remain available if an individual was limited to occasional pushing, pulling and lifting.  Tr. 71-72.

packager jobs at the sedentary level, that number is not relevant since the RFC assessed Chapman as capable of light work and the VE referenced the availability of inspector/hand packager jobs at the sedentary level only in response to an alternative hypothetical that was not adopted by the ALJ.  Thus, the fact that separate jobs numbers for the inspector/hand packager job were not provided at the sedentary level is not a basis for reversal and remand.

### 3. The ALJ considered Chapman's migraine headaches and syncope when formulating the RFC and properly considered and explained the weight provided to the opinion of Chapman's treating cardiologist Dr. Constantini

Chapman claims that the ALJ rejected her treating cardiologist's opinion without good reasons and failed to adequately consider her migraines and syncope.  Doc. 15, pp. 9-10.   Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).

If controlling weight is not provided, an ALJ must apply certain factors to determine what weight should be given to the treating source's opinion, and the Commissioner's regulations also impose a duty on an ALJ always to give good reasons in the notice of determination or decision for the weight given to treating source opinions.[22]  *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)); *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).  "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any

---

[22] The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(c), 416.927(c).

subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion

and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996

SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

Here, the ALJ considered, weighed and provided good reasons for the weight she

assigned to Dr. Constantini's opinion.  With respect to that opinion, the ALJ stated:

> [T]he undersigned has considered the medical source statement of Otto Constantini, the claimant's treating cardiologist.  This physician opined that the claimant could stand or walk for up to two hours, lift up to 10 pounds occasionally, but sitting was not affected.  The treating source also noted that the claimant could not work in hazardous environment due to fall risk.   Dr. Constantini concluded that claimant was "unemployable" on the check-list form assessment.  (11/3/2009, Exhibit 7F, p. 3).  The undersigned can afford only partial weight to this opinion, as it is not fully supported by the objective medical evidence of record.   The determination of disability is reserved to the Commissioner.  While the undersigned accepts the limitations on hazardous work conditions due to the history of falls, this physician did not indicate any clinical findings that would be consistent with ongoing limitations on standing and walking, as it appears the physician made this assessment when the claimant was still in a wheelchair following her fall.  As noted above, more recent physical examinations revealed normal gait, range of motion, sensation, and motor strength, which is inconsistent with these limitations advanced by the treating source.   Further, there is no evidence that the claimant followed up on recommended treatment with this source.  In fact, a treatment note from Dr. Constantini indicated "she asked me to fill out SSI disability papers because she keeps losing jobs based on these fainting spells.  When she is able to stand, I will get a tilt table test," which was inconsistent with the limitations he advanced in the treating source statement.  (10/30/2009, Exhibit 1F, p. 66).

Tr. 19-20.  As reflected in her decision, the ALJ adopted Dr. Constantini's opinion with respect

to hazardous work conditions.  Tr. 20.  With respect to the balance of his opinion, the Court finds

no error in the ALJ's treatment of Dr. Constantini's opinion and Chapman has not argued or

demonstrated how the ALJ's detailed explanation is either unsupported by the record or does not

constitute good reasons for giving Dr. Constantini's opinion less than controlling weight.

Chapman's contention that the ALJ failed to consider her migraines or syncope or

account for symptoms related to those conditions in the RFC is unfounded.  In assessing

Chapman's RFC and assessing her credibility, the ALJ clearly considered Chapman's migraines and syncope, including her subjective allegations regarding the severity of those conditions.  Tr. 17-20.  For example, the ALJ stated:

> The clinical findings and treatment history are also not fully consistent with the claimant's allegations that she would miss two or more days of work per month due to migraines and fainting episodes.  The claimant presented to her primary care physician with complaints of dizziness, difficulty breathing, headaches, and blackouts, an MRI of the brain on April 24, 2008 revealed an Arnold-Chiari malformation, with mild compression of the cervicomedullary junction. (Exhibit 2F, p. 4).  No surgery was suggested for this malformation.  The claimant had a normal EEG on September 15, 2009.  Treating cardiologist Otto Constantini, MD noted that the claimant's episodes of syncope appeared neurocardiogenic, but the claimant did not follow up on the tilt test following resolution of her pelvic fracture.  The claimant has not received further workup on these episodes. The claimant sought evaluation of her migraine headaches, but currently takes only non-prescribed Tylenol with codeine for her headaches.

Tr. 18.

The ALJ proceeded to discuss and take into consideration the fact that, despite Chapman's long history of syncopal episodes, her work history demonstrated that she had experienced many years of significant earnings and the evidence did not demonstrate a significant worsening or increase in the episodes since Chapman had stopped working.  Tr. 18.  The ALJ found that the evidence indicated that Chapman's impairment(s) were not as limiting as she alleged.[23]  Tr. 18, 20.

Although the ALJ did not find Chapman's impairment to be as limiting as she alleged, the ALJ included limitations in the RFC to account for her  risk of falling by including limitations requiring avoidance of exposure to unprotected heights and industrial machinery and no climbing ladders, ropes or scaffolds.   Tr. 16.  The ALJ also included a limitation requiring

---

[23] It is not clear that Chapman is directly challenging the ALJ's assessment of her credibility.  However, an ALJ's credibility findings are to be accorded great weight and deference and Chapman has not shown that the ALJ's credibility assessment is not supported by substantial evidence. *See e.g,, Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

avoidance of exposure to fumes, dust and environmental pollutants. Tr. 16. The VE hypothetical accurately portrayed the limitations that the ALJ found credible and Chapman has failed to demonstrate that the evidence supported greater RFC limitations.

Based on the foregoing, Chapman has failed to demonstrate that the ALJ failed to fully and adequately consider and discuss the medical evidence or that the RFC and Step Five finding are not supported by substantial evidence. Accordingly, reversal and remand is not warranted.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: March 5, 2015

Kathleen B. Burke
United States Magistrate Judge